USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _8/30/11_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------X

LUIS MARINO and GUSTAVO SERPA,

                  Plaintiffs,                10 Civ. 4126

   -against-                          OPINION

GRUPO MUNDIAL TENEDORA, S.A.,
BELNOVO, S.A., GLOBAL PLUS+
INVESTMENT MANAGEMENT LLC, and
GPIM HOLDINGS, INC.,

                  Defendants.

------------------------------------------X

A P P E A R A N C E S:

        Attorneys for Plaintiffs

        YESKOO, HOGAN & TAMLYN LLP
        909 Third Avenue, 28th Floor
        New York, NY 10022
        By:  Stephen Hogan, Esq.

        Attorneys for Defendants

        CURTIS, MALLET-PREVOST, COLT and MOSLE LLP
        101 Park Avenue
        New York, NY 10178
        By:  Theresa Ann Foudy, Esq.
            Brian M. White, Esq.

**Sweet, D.J.**


Defendants Belnovo, S.A. ("Belnovo") and Grupo Mundial Tenedora, S.A. ("GM") (collectively, the "Defendants") have moved pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) to dismiss the Second Amended Complaint ("SAC")[1] of plaintiffs Luis Marino ("Marino") and Gustavo Serpa ("Serpa") (collectively, the "Plaintiffs") for failure to plead fraud with particularity and failure to state a claim.  Upon the conclusions set forth below, Defendants' motion to dismiss the SAC as to GM and Belnovo is granted, and the Plaintiffs are granted leave to replead within twenty days.


**<u>Prior Proceedings</u>**


This action was commenced by the Plaintiffs on May 19, 2010.  The Amended Complaint ("AC") was filed on June 2, 2010, and the SAC was filed on April 5, 2011.


On September 7, 2010, Defendants GPIM Holdings, Inc. ("GPIM Holdings") and Global Plus+ Investment Management LLC

---

[1]     The SAC, filed as set forth, does not differ from the Amended Complaint as to these Defendants and the motion is deemed to be directed to the SAC, the latter filed pleading.

("GPIM") moved to dismiss the AC, a motion which was denied in part and granted in party by the opinion of March 17, 2011 (the "March 17 Opinion").  Plaintiffs filed a motion to file a Second Amended Complaint on October 1, 2010, which was granted in the March 17 Opinion.

The allegations of the SAC as described in the March 17 Opinion are repeated in part as relevant to the issue presented by the instant motion.

According to the Second Amended Complaint, Plaintiffs were employees of Pali Capital ("Pali"), who decided together with Pali to form GPIM in order to manage Pali's investment funds.  (SAC ¶ 13.)  The parties entered into a Limited Liability Company Agreement (the "LLC Agreement") in January of 2008 for that purpose.  (Id. ¶ 16.)  By the LLC Agreement, Belnovo, Pali Holdings Asset Management LLC (a wholly-owned subsidiary of Pali Capital, also denoted "Pali"), and the Plaintiffs became members in GPIM.  The voting interests in GPIM were split two ways: 72.5% for Pali and 27.5% for Belnovo. (Id.; LLC Agreement § 4.1., Schedule A)  The economic interests were divided four ways:  Belnovo maintained the same 27.5% interest that it had for voting; but Pali's 72.5% interest was split

among Pali (21.75%), Marino (25.375%), and Serpa (25.375%).
(SAC ¶ 16; LLC Agreement § 4.1, Schedule A.)

GPIM was to be managed by a seven-member "Board of
Managers," consisting of four managers appointed by Pali, two by
Belnovo, and one by the "Senior Managing Director," who was
Marino. (LLC Agreement §§ 3.2(a), 3.6(b).)  Serpa was named a
"Managing Director" and the Senior Managing Director's nominee
to the Board of Managers.  (Id. §§ 3.2(a), 3.6(c).)  In terms of
capital contributions, Belnovo contributed $1.5 million; Pali
contributed certain costs, goodwill, and services; and Marino
and Serpa contributed nothing.  (See id. § 5.2.)

The LLC Agreement specified that the Managing
Directors (namely, Plaintiffs) "shall owe to the Members duties
of loyalty and due care of the type owed by the officers of a
corporation to such corporation and its stockholders under the
laws of the State of Delaware." (Id. §§ 3.5, 3.6(c).)  In
contrast, with respect to Members, the LLC Agreement stated:

> No Member, including any Manager or Managing Director
> in its capacity as such, shall have any liability
> under this Agreement or under the [Delaware Limited
> Liability Company] Act except as provided herein or as
> required by the Act. . . . ; provided, however, that
> the liability of a Member shall not be eliminated or

3

limited if a judgment or other final adjudication
adverse to such Member establishes (i) that its acts
were committed in bad faith or were the result of
active or deliberate dishonesty or (ii) that such
Member personally gained in fact a financial profit or
other advantage to which such Member was not entitled.

(Id. § 4.3.)

The LLC Agreement contained specific provisions
regarding the transfer of membership interests.  In particular,
it stated that each of Pali and Belnovo could transfer its own
respective interest at any time to an "Affiliate."  (Id. § 7.1.)
If either Pali or Belnovo wished to transfer its interest other
than to its own affiliate, it had to first give the other a
right of first offer ("ROFO").  (Id. § 7.2.)  Under Section
7.3(a), if Belnovo failed to exercise its ROFO after receiving
notice that Pali desired to sell its interest, Pali was given
the authority to approve a sale of 100% of the membership
interests and force the other Members (namely, Belnovo and
Plaintiffs) to sell their interests on the same terms (a
"Required Sale").  (Id. § 7.3(a).)

The LLC Agreement contained certain conditions
regarding a "Required Sale" and specified that "each Member
hereby waives all dissenters' rights, appraisal rights, approval

4

rights or other similar rights in connection with a Required
Sale to the maximum extent permitted by law." (Id. § 7.3(a).)

The SAC alleges that, during 2008, GM had invested $20
million in Pali, but then "threatened to sue" Pali because Pali
had failed to disclose material information before the
investment was made. (SAC ¶¶ 24-26.) "Upon information and
belief," GM "desired to acquire total control of GPIM" and Pali
"agreed to cede its membership interests in GPIM" to appease GM.
(Id. ¶ 28.) Thus, "upon information and belief," Pali and
Belnovo agreed to transfer GPIM to a GM-owned subsidiary at less
than fair value in an act of "self-dealing." (Id. ¶ 29.)

According to the SAC, in order to avoid any methods of
fair valuation, Pali and Belnovo "designed a scheme whereby
Plaintiffs would be induced to make a below market offer at
terms established by Defendants, which Defendants could then use
as the 'valuation' of the company for their own self-dealing
acquisition." (Id. ¶ 31.) In particular, at a meeting of the
GPIM Board on January 7, 2009, the "GM representatives" (Rodrigo
Diaz, Executive Vice President of GM, and Juan Carlos Barrera)
allegedly informed Plaintiffs that GM had decided not to invest
any more money in GPIM and suggested that Plaintiffs acquire

Pali's interest themselves.  (Id. ¶ 32.)  At a subsequent
meeting on January 16, 2009, the "Board" (Diaz, Barrera, Joseph
Schenk, CEO of Pali, John Mullin, CFO of Pali, Tricia Pessola,
Pali Compliance Officer, and Derrell Janey, Pali Executive Vice
President), informed Plaintiffs that Pali and GM had "decided to
exit the business and divest themselves of ownership of GPIM."
(Id. ¶¶ 32-33.)  The "Board" asked Plaintiffs to prepare an
offer to acquire GPIM and told them that it need not contain a
significant cash component and that, if Plaintiffs did not
acquire GPIM, GPIM would be dissolved.  (Id.)  The SAC alleges,
"on information and belief," that these statements were "utter
falsehoods" designed to "engineer a low offer from Plaintiffs so
that [GM] could buy the interests of [Pali] and plaintiffs at
that price" and that in fact "[n]either Pali . . . nor Belnovo
had any intention of selling their membership interests in GPIM
to plaintiffs at any price because they had already agreed to
transfer their interest to [GM's] subsidiary established to
accomplish their scheme."  (Id. ¶ 34.)

      By a letter dated January 26, 2009, an attorney
representing Plaintiffs forwarded to GPIM's Board Plaintiffs'
offer to purchase GPIM.  The letter and attached proposal stated
that it was intended to address the requirements outlined during

6

the January 16, 2009 Board meeting by Joseph A. Schenk, whom the SAC identifies as a Pali Board representative (Id. ¶ 32).   The proposal states that Plaintiffs would purchase for $1 – and the assumption of GPIM's operating liabilities accruing on and after the closing – all the assets of GPIM plus certain additional assets of Pali and Mundial Asset Management.

The SAC alleges that after Plaintiffs refused to resign, they were fired.  (Id. ¶¶ 35-36.)  The GPIM Board rejected Plaintiff's offer.  (Id. ¶ 36.)

Pali and Belnovo then sold their interests to GPIM Holdings, a wholly-owned subsidiary of GM, for $1,000 plus assumption of all liabilities. (Id. ¶ 37.)  By letters dated February 11, 2009, Pali issued notices to all three of Belnovo, Marino, and Serpa, informing them that Pali, following the offer by GPIM Holdings to purchase GPIM and Belnovo's failure to exercise its ROFO, was exercising its right to force Belnovo and Plaintiffs to sell their membership interests to GPIM Holdings in a "Required Sale" pursuant to Section 7.3 of the LLC Agreement.  Plaintiffs assert that Defendants made no "effort to secure a fair price for GPIM" nor to "appraise the fair market value of the business."  (Id. ¶ 38.)

7

The SAC asserts the following three claims for relief against Belnovo and GM.  First, Plaintiffs allege that Belnovo breached a fiduciary duty not to sell GPIM at less than fair market value. (Id. ¶¶ 50-53.)  Second, Plaintiffs allege that Belnovo and GM conspired "to transfer GPIM to GPIM Holdings at an unfair price."  (Id. ¶¶ 54-57.)  Third, Plaintiffs allege that GM aided and abetted Belnovo's breach of fiduciary duty by establishing GPIM Holdings to purchase GPIM and by "exercising its financial power" over Pali to "execute a scheme to sell GPIM . . . at an unfairly low price."  (Id. ¶¶ 58-63.)

The SAC concludes that the Plaintiffs were thus each harmed "by not less than $2,000,000."  (Id. ¶¶ 53, 57, 63.)

The instant motion was marked fully submitted on April 27, 2011.

**The Appropriate Standards**

Federal Rule of Civil Procedure 9(b) requires that, "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

8

Fed. R. Civ. P. 9(b).  The concerns animating Rule 9(b) are (1) to provide a defendant with fair notice of the claims against it; (2) to protect a defendant from harm to its reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits. See DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987).

        To avoid speculative and conclusory claims and thereby comply with Rule 9(b), the Second Circuit has held that Rule 9(b) requires that a party "(1) specify the statements that the Plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (quoting Mills v. Polar Molecular, 12 f.3d 1170, 1175 (2d Cir. 1994)).  "'The requisite 'strong inference' of fraud may be established either by: (a) alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290-91 (2d Cir. 2006) (quoting Shields v. City Trust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994)).

This rule applies to all claims that sound in fraud, as determined by the wording and imputations of the complaint, regardless of the label used in the pleading. See Rombach, 355 F.3d at 172 (applying Rule 9(b) where "the wording and imputations of the complaint [were] classically associated with fraud"); Apace Commc'ns Ltd. v. Burke, 522 F. Supp. 2d 509, 514 (W.D.N.Y. 2007) (applying Rule 9(b)'s pleading requirements where claims were based on allegations of fraud, although not "denominated as fraud claims").

The SAC alleges that GM and Pali "engineer[ed] a plan to transfer GPIM to GM's subsidiary GPIM Holdings at an unfair price" (SAC ¶ 29); "Defendants agreed to avoid all methods of valuation that would have resulted in a fair value for the transaction" and then "designed a scheme whereby Plaintiffs would be induced to make a below market offer, which Defendants could then use as the 'valuation' of the company for their own self-dealing acquisition" (id. ¶ 31); the Plaintiffs were induced to make a low offer by "utter falsehoods" stated by Pali and/or GM (id. ¶¶ 33-34); Belnovo "acted in bad faith, with deliberate dishonesty and with willful misconduct" (id. ¶ 52); and GM aided and abetted the actions of Belnovo by "knowingly

10

participat[ing] in the scheme to defraud plaintiffs by acquiring GPIM's assets [at] less than fair value" (id. ¶ 62).

These allegations sound in fraud and the pleading requirements of Rule 9(b) are applicable.  See DeBlasio v. Merrill Lynch & Co., Inc., No. 07 Civ. 318, 2009 U.S. Dist. LEXIS 64848, at *34 (S.D.N.Y. July 27, 2009) (claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty that sound in fraud must meet Rule 9(b)); Pacific Elec. Wire & Cable Co. v. Set Top Int'l. Inc., No. 03 Civ. 9623, 2005 U.S. Dist. LEXIS 3811, at *44-*45 (S.D.N.Y. 2005) (finding "[b]oth counts [for breach of fiduciary duties and aiding and abetting breach of fiduciary duties] state that Defendants breached their fiduciary duties to Plaintiffs by making material misrepresentations to Plaintiffs.  These claims sound in fraud and must meet the heightened pleading standard of Rule 9(b).") (internal quotation marks and citation omitted).

The Rule 12(b) standard set forth in the March 17 Opinion, slip op. at 7-8, is applicable here.

**The Amended Complaint Fails To State a Claim
For Breach Of Fiduciary Duty Against Belnovo**

11

As this case arises under the diversity jurisdiction of a federal court sitting in New York, New York's conflict of law rules apply to Plaintiffs' claims.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  New York applies the internal affairs doctrine to claims for breach of fiduciary duty and, thus, applies the law of the state of incorporation to such claims.  See Walton v. Morgan Stanley & Co., Inc., 623 F.2d 796, 798 n.3 (2d Cir. 1980) (noting that the choice-of-law rules of New York dictate "that the law of the state of incorporation governs an allegation of breach of fiduciary duty owed to a corporation"); Steinberg v. Sherman, No. 07 Civ. 1001, 2008 U.S. Dist. LEXIS 37367, at *10 (S.D.N.Y. May 8, 2008) ("For breach of fiduciary duty claims, New York applies the law of the state of incorporation.") (citing Walton, 623 F.2d at 798 n.3); In re Hydrogen, LLC, No. 08-14139, Adv. Pro. No. 09-01142, 2010 Bankr. LEXIS 1106, at *12 (Bankr. S.D.N.Y. Apr. 20, 2010) (collecting cases and applying rule to limited liability company).  GPIM is a Delaware limited liability company and, therefore, Delaware law governs the fiduciary duty claim asserted here.

Under Delaware law, the elements of a claim for breach of fiduciary duty include (i) the existence of a fiduciary duty

12

and (ii) a breach of that duty.  See York Linings v. Roach, No.
16622-NC, 1999 WL 608850, at *2 (Del. Ch. July 28, 1999); Heller
v. Kiernan, No. Civ. A. 1484-K, 2002 WL 385545, at *3 (Del. Ch.
Feb. 27, 2002), aff'd, 806 A.2d 164 (Del. 2002).  Here,
Plaintiffs claim Belnovo breached a fiduciary duty "not to sell
GPIM at less than fair market value."  (SAC ¶ 51.)  However,
Delaware Law would recognize no such fiduciary duty by Belnovo
on these facts, especially in light of the LLC Agreement's
specific provisions in this regard.

        The Delaware Limited Liability Company Act allows an
LLC agreement to alter common law fiduciary duty rules by
restricting, expanding, or eliminating LLC members' or managers'
fiduciary duties.  See Del. Code Ann. tit. 6, § 18-1101(c)
(2009).  The relevant provision states:  "To the extent that, at
law or in equity, a member or manager or other person has duties
(including fiduciary duties) to a limited liability company or
to another member or manager or to another person that is a
party to or is otherwise bound by a limited liability company
agreement, the member's or manager's or other person's duties
may be expanded or restricted or eliminated by provisions in the
limited liability company agreement; provided, that the limited

13

liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing." Id.

The policy of the Delaware Act is "to give maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements." Id. § 18-1101(b); Elf Atochem N. Am., Inc. v. Jaffari, 727 A.2d 286, 291 (Del. 1999) ("The basic approach of the Delaware Act is to provide members with broad discretion in drafting the Agreement"); see also In re S. Canaan Cellular Invs., LLC, 427 B.R. 85, 100-01 (Bankr. E.D. Pa. 2010) ("[Delaware] law permits the LLC's operating agreement to define the duties (including fiduciary duties) owed to the entity by its members, managers, or other parties to the agreement."), aff'd in part and rev'd in part by 2010 WL 3306907 (E.D. Pa. Aug. 16, 2010); Douzinas v. Am. Bureau of Shipping, Inc., 888 A.2d 1146, 1149, 1152 (Del. Ch. 2006) (finding that in the context of an LLC, "it is frequently impossible to decide fiduciary duty claims without close examination and interpretation of the governing instrument of the entity" and noting that "this court's duty is to respect the contract freely entered into by all members").

14

Here, the LLC Agreement contained a provision allowing either Pali or Belnovo to force Plaintiffs to sell their membership interests under certain circumstances in a "Required Sale." Although the SAC alleges that Pali and Belnovo allegedly designed a scheme to avoid appraising the fair value of the business, there is no requirement of fair value for a "Required Sale" under the Agreement. In addition, the LLC Agreement specifies that "each Member hereby waives all dissenters' rights, appraisal rights, approval rights or other similar rights in connection with a Required Sale to the maximum extent permitted by law." (LLC Agreement § 7.3(a).)

In addition, minority members of an LLC do not owe fiduciary duties to other members. See In re S. Canaan, 427 B.R. at 102-03 ("[D]elaware common law does not impose fiduciary and other related duties to members of LLCs who are neither managers nor controlling members."); Kuroda v. SPJS Holdings, L.L.C., No. 4030-CC, 2010 WL 925853, at *7 n.28 (Del. Ch. Mar. 16, 2010) ("Tellingly, defendants have not provided a single citation or reference to a Delaware statute or case that imposes fiduciary duties on non-managing or non-controlling members of an LLC."); Kelly v. Blum, No. 4516-VCP, 2010 Del. Ch. LEXIS 31, at *3 (Del. Ch. Feb 24, 2010) ("[E]ven though contracting

15

parties to an LLC agreement have the freedom to expand,
restrict, or eliminate fiduciary duties owed by managers to the
LLC and its members and by members to each other, in the absence
of a provision explicitly altering such duties, an LLC's
managers and controlling members in a manager-managed LLC owe
the traditional fiduciary duties that directors and controlling
shareholders in a corporation would.").

    Belnovo owned 27.3% of GPIM, possessed 27.5% voting
interests, and was not a manager or a controlling member. (See
SAC ¶ 16.)

    The Plaintiffs concede that, even in the absence of
contractual provisions eliminating fiduciary duties, controlling
members of an LLC owe fiduciary duties to other members and that
Belnovo owned only 27.5% of the LLC.  (See Pls. Mem. 11-12.)
Plaintiffs claim that Belnovo can nonetheless be viewed as
"controlling," because it allegedly acted in concert with Pali.
Plaintiffs allege that "Pali Holdings AM and Belnovo, acting in
concert, were the controlling members of GPIM, accounting for
100% of the voting interest in GPIM.  As such they owed
plaintiffs, the other members of GPIM, fiduciary duties . . . ."
(SAC ¶ 29.)  However, Plaintiffs' sole support for that

assertion, Kelly v. Blum, 2010 Del. Ch. LEXIS 31, (see Pls. Mem.
at 11-12), does not support their position.

          In Kelly, one member who owned 24% of the LLC was
found to jointly be "controlling" with a member that owned over
50%, when both voted in favor of a merger to which a minority
member objected.  However, the two members at issue - namely,
MBC Investment and MBC Lender - were, as their names imply,
affiliated entities.  Both were wholly-owned subsidiaries of ELB
Capital Management, LLC.  See Kelly, 2010 Del. Ch. LEXIS 31, at
*5, *55.  The two members were jointly represented and moved to
dismiss together.  The member who owned only 24% did not make
the argument, which Belnovo makes here, that it was not
controlling--presumably because of its affiliate relationship
with the majority member.

          Here, there is no allegation that Pali and Belnovo
were related entities.  The reasoning of Kelly is therefore
inapplicable.  Under Plaintiffs' argument, any time multiple
members who combine to over 50% of the voting interests agree to
a transaction, the aggrieved member could argue that the
multiple members acting together were "controlling."  Plaintiffs
cite no authority for such a rule, which would, in effect,

impose fiduciary duties upon minority members or shareholders as "controlling" for purposes of a specific transaction because they voted with the majority in regards to that transaction.

Moreover, even if Belnovo owed a duty, Plaintiffs' allegations do not establish that Belnovo breached that duty. Pali, not Belnovo, triggered the "Required Sale" under Section 7.3 of the LLC Agreement that forced Belnovo to sell its GPIM interests for the same share of $1,000 that Plaintiffs received. Although the SAC alleges "upon information and belief" that Pali triggered the "Required Sale" to appease GM in unrelated business dealings (SAC ¶ 28), that does not change the allegation that it was Pali, not Belnovo, that triggered the Required Sale. Belnovo's involvement was that:  (i) it was a minority member of the LLC owned by GM, a non-member which created another subsidiary to buy out Pali; and (ii) it was subjected by Pali to the same Required Sale as Plaintiffs.  All that Belnovo did in connection with the sale was to decline to exercise a ROFO.  Had Belnovo exercised the ROFO, the result to Plaintiffs would have been no better:  a Required Sale to Belnovo instead of a Required Sale to GPIM Holdings.  (LLC Agreement § 7.3.)

The SAC maintains that an alleged subsidiary of GM, GPIM Holdings, was the purchaser, it alleges a claim for breach of fiduciary duty against Belnovo. (SAC ¶¶ 50-53.)  However, with respect to Belnovo, Plaintiffs have alleged no affirmative action at all.  The Plaintiffs' opposition brief asserts that Belnovo is a "shell" of GM, whose separate corporate existence should be disregarded.  (Pls. Mem. 7-9.)  The SAC does not assert a claim for veil piercing nor do Plaintiffs anywhere address whether a corporate veil can be pierced under Panamanian law and, if so, under what circumstances.  Both Belnovo and GM are Panamanian corporations (SAC ¶¶ 3-4), and whether the corporate veil can be pierced is analyzed under the law of the place of incorporation.  See, e.g., Sykes v. Mel Harris & Assocs., LLC, 09 Civ. 8486, 2010 WL 5395712, at *11 (S.D.N.Y. Dec. 29, 2010) ("Generally, the veil-piercing analysis is governed by the law of the place of incorporation.") (citing United States v. Funds Held in the Name or for the Benefit of Wetterer, 210 F.3d 96, 106 (2d Cir. 2000)).  Under Delaware Law, being a "shell" corporation does not alone suffice to pierce a corporate veil.  See Laifail, Inc. v. Learning 2000, Inc., Nos. C.A.01-599 GMS, C.A.01-678 GMS, 2002 WL 31667861, at *12 (D. Del. Nov. 25, 2002).

19

Even if the corporate veil between the two entities should be pierced under Panamanian law, it would still not demonstrate that Belnovo breached any fiduciary duty to Plaintiffs in the first instance; instead, it would show only that GM could be found liable to the extent Belnovo was liable. However, here, the allegation that Belnovo is liable for breach of fiduciary duty is insufficient as Belnovo was neither a manager nor a controlling member of the LLC.

**The Amended Complaint Fails To State A Claim For Civil Conspiracy Against Defendants**

Parties to this suit reside in a variety of locations, including Panama, Delaware, New York, and Connecticut. However, only Delaware and New York have a substantial connection to all parties and occurrences at issue. Delaware is the place of incorporation of GPIM and GPIM Holdings, and the LLC Agreement contains a Delaware choice of law provision. New York is the forum state, the place of residence of the two Plaintiffs, the location of the majority of the occurrences alleged in the AC, (SAC ¶¶ 9-10), and the principal place of business of GPIM during the events in question.

20

In the event of an actual conflict between New York and Delaware law, since it appears that New York was the place in which the allegedly tortious events took place, New York law would normally apply to tort claims, such as one for conspiracy, arising from those events. See Steinberg, 2008 U.S. Dist. LEXIS 37367, at *10 (holding with respect to a civil conspiracy claim "the location of the tort generally determines the applicable law" (citing AroChem Intern. Inc. v. Buirkle, 968 F.2d 266, 270 (2d Cir. 1992)).  However, because the application of New York or Delaware law leads to the same result here, the Court need not choose which state's law to apply.  See In re WorldCom, Inc., 368 B.R. 308, 328 n.2 (Bankr. S.D.N.Y. 2007) (where civil conspiracy laws are "similar," a court may proceed with its analysis without making a determination of the applicable law).

Under the law of either Delaware or New York, conspiracy is not an independent tort, but a theory under which a party can establish the vicarious liability of co-conspirators for each other's offenses.  See Green v. Beer, No. 6 Civ. 4156, 2009 U.S. Dist. LEXIS 27503, at *3 n.1 (S.D.N.Y. Mar. 30, 2009) ("[U]nder New York law, there is no independent action for civil conspiracy.  Instead, civil conspiracy is a theory of vicarious liability pursuant to which defendants can be held liable for

21

the fraudulent actions of their co-conspirators.") (citing

Crigger v. Fahnestock & Co., 443 F.3d 230, 237 (2d Cir. 2006);

Beck v. Prupis, 529 U.S. 494, 503, 120 S. Ct. 1608, 146 L. Ed.

2d 561 (2000); Canada, Inc. v. Aspen Technology, Inc., 544 F.

Supp. 2d 199, 231-32 (S.D.N.Y. 2008)); Hamilton Partners, L.P.

v. Englard, 11 A.3d 1180, 1211 (Del. Ch. 2010) ("Like Delaware,

New York does not recognize civil conspiracy to commit a tort as

an independent cause of action . . . just as in Delaware, the

claim stands or falls with the underlying tort." (citing Pappas

v. Passias, 271 A.D.2d 420, 707 N.Y.S.2d 178, 180 (N.Y. App.

Div. 2000); Salvatore v. Kumar, 45 A.D.3d 560, 845 N.Y.S.2d 384,

388 (N.Y. App. Div. 2007); Empire Fin. Servs., Inc. v. Bank of

New York (Del.), 900 A.2d 92, 98-99 (Del. 2006)).  Thus, in

order to adequately plead a claim for civil conspiracy, a

plaintiff must establish first the underlying tort that the

parties have conspired to commit.


Once the underlying tort is established and deemed

sufficiently supported by factual allegations, a plaintiff must

establish:  "(1) an agreement between two or more parties; (2)

an overt act in furtherance of the agreement; (3) the parties'

intentional participation in the furtherance of a plan or

purpose; and (4) resulting damage or injury."  Meisel v.

22

Grunberg, 651 F. Supp. 2d 98, 119 (S.D.N.Y. 2009) (citing World Wrestling Fed'n Entm't, Inc. v. Bozell, 142 F.Supp.2d 514, 532-33 (S.D.N.Y. 2001)); see also Allied Capital Corp. v. GC-Sun Holdings, L.P., 910 A.2d 1020, 1036 (Del. Ch. 2006) (in Delaware, "a plaintiff must plead facts supporting (1) the existence of a confederation or combination of two or more persons; (2) that an unlawful act was done in furtherance of the conspiracy; and (3) that the conspirators caused actual damage to the plaintiff" (citing Nicolet, Inc. v. Nutt, 525 A.2d 146, 149-50 (Del. 1987))).

Claims of civil conspiracy which do not allege, or which insufficiently allege, an underlying tort must be dismissed for failure to state a claim under Rule 12(b)(6). See Meisel, 651 F. Supp. 2d at 119 ("Under New York law, a claim for civil conspiracy may stand only if it is connected to a separate underlying tort." (citations omitted)); Corbett v. eHome Credit Corp., No. 10 Civ. 26, 2010 U.S. Dist. LEXIS 27287, at *8 n.5 (E.D.N.Y. Mar. 22, 2010) ("A claim for civil conspiracy is only actionable if the complaint states a claim for the underlying tort." (citations ommitted)); accord Kuroda, 971 A.2d at 892 (same).

23

The SAC does not specify the tort underlying Plaintiffs' civil conspiracy claim, but alleges a "conspiracy whereby [defendants] agreed to transfer GPIM to GPIM Holdings at an unfair price." (SAC ¶ 55.)  If it assumed that Belnovo's alleged breach of fiduciary duty is meant to be the underlying tort, for the reasons stated above, the breach of fiduciary duty claim is dismissed.  Because these claims must stand or fall together, the civil conspiracy claim is likewise dismissed.  See Filler v. Hanvit Bank, 156 Fed. Appx. 413, 418 (2d Cir. 2005) ("A claim of conspiracy cannot stand alone and must be dismissed if the underlying independent tort has not been adequately pleaded."); Ho Myung Moolsan Co., Ltd. v. Manitou Mineral Water, Inc., 665 F. Supp. 2d 239, 256 (S.D.N.Y. 2009) (claim for "Conspiracy to Violate the Law" was properly dismissed for failure to state an underlying claim); Berwick v. New World Network Int'l, Ltd., No. 06 Civ. 2641, 2007 U.S. Dist. LEXIS 22995, at *19 (S.D.N.Y. Mar. 27, 2007) ("New York . . . does not recognize civil conspiracy as an independent tort; such a claim stands or falls with the underlying tort." (citations and internal quotation marks ommitted)); Kuroda, 971 A.2d at 892 ("Plaintiff has thus failed to state a claim for civil conspiracy because he has not properly alleged an underlying wrong on which a claim of conspiracy could be based.").

24

In addition, "'[i]n order to sustain an allegation of
civil conspiracy that involves a conspiracy to breach a
fiduciary duty, all members of the alleged conspiracy must
independently owe a fiduciary duty to the plaintiff.'"
Briarpatch Ltd. L.P. v. Geisler Roberdeau, Inc., No. 99 Civ.
9623, 2007 U.S. Dist. LEXIS 27001, at *78 (S.D.N.Y. April 4,
2007) (quoting Pope v. Rice, No. 04 Civ. 4171, 2005 U.S. Dist.
LEXIS 4011, at *13 (S.D.N.Y. March 14, 2005)).  The SAC does not
allege that GM owed Plaintiffs any fiduciary duty.

Plaintiffs do not adequately allege overt acts and
intentional participation in furtherance of the alleged plan.
With respect to Belnovo, it declined to exercise a ROFO and thus
become subject to the same Required Sale to which Plaintiffs
were subject.  With respect to GM, purportedly as part of a
scheme to "engineer a low offer from Plaintiffs," employees of
GM allegedly said that GM had decided to invest no more money in
GPIM and suggested the Plaintiffs acquire GPIM themselves. (SAC
¶¶ 32-34.)  However, given that the LLC Agreement contains no
requirement for bidding, appraisal, or fair market value in
connection with a Required Sale, such a scheme is entirely

irrelevant to the wrong alleged of forcing plaintiffs to sell in
a Required Sale at an unfair price.

In sum, the Plaintiffs' civil conspiracy claim against
Belnovo and GM is dismissed for failure to allege an underlying
tort.  GM is not alleged to have owed any fiduciary duty to the
Plaintiffs, and the SAC is devoid of allegations of actions
taken by either Belnovo or GM that could be considered an overt
act or intentional participation in the alleged conspiracy.

Plaintiffs do not deny that they contractually waived
any right to complain of the sale price (LLC Agreement § 7.3)
and gave Pali the ability to force a sale of their interests in
a "Required Sale" without any requirement of an appraisal or a
fair market value determination.  (Id.)  In the face of Delaware
law that gives maximum effect to the principle of freedom of
contract up to and including the ability to waive fiduciary
duties, Del. Code Ann. tit. 6, § 18-1101(b) (2009), Plaintiffs'
claim must be dismissed as contrary to the contract entered
into.

In response, the Plaintiffs have cited In re Atlas
Energy Res., LLC, Unitholders Litig., No. 4589-VCN, 2010 Del.

Ch. LEXIS 216 (Del. Ch. Oct. 28, 2010).  (Pls. Mem. 12-16).

Plaintiffs argue that in Atlas, "there was a specific section of

the LLC Agreement addressing conflicts of interest that arise in

a self-dealing transaction, but the Court found that the

specific waiver of liability for breach of fiduciary duties in

such a conflict did not exculpate the defendant."  (Id. at 13).

However, the contractual provisions on which the Atlas

defendants relied applied to parties other than the plaintiffs,

and it was because the contract did not address the conduct

complained of that the Atlas court found that common-law

fiduciary duties of controlling members adhered and denied the

motion to dismiss.  More fundamentally, as noted above, Belnovo

was not a controlling member in any event.  However, the court

was also clear that, had the plaintiffs contracted away the

common-law rights, that waiver would have been enforced and the

case dismissed:

> Just as a merger between a parent and its corporate
> subsidiary inherently threatens the interests of
> minority shareholders, a merger between a parent and
> its publicly held limited liability company subsidiary
> inherently threatens the rights of minority
> unitholders.  The difference is that, in the context
> of a limited liability company, the parties can
> specify by contract the protections, or lack thereof,
> that they want the minority to have against such
> threats.  If they do so, a court will respect the
> parties' freedom of contract and will not apply the
> default standard.

Atlas, 2010 Del. Ch. LEXIS 216, at *34-*35.  Here, the contract
specifies the lack of protections in the waiver language, which
will be respected.

        The Plaintiffs contend that the LLC Agreement
provisions in this regard do not specify that they apply to
"self-dealing" transactions involving a "conflict of interest."
However, once again, it was not Belnovo that made the decision
to sell GPIM to another subsidiary of its parent company, it was
Pali.  Because Pali is unrelated to any of Belnovo, GM or GPIM
Holdings, Pali's decision to sell GPIM to GPIM Holdings did not
represent a "conflict of interest" nor was it "self-dealing."

**The Allegations of Aiding and Abetting A Breach Of Fiduciary
Duty Against GM Are Insufficient**

        The fourth count of the SAC alleges that GM aided and
abetted Belnovo's alleged breach of fiduciary duty.  (SAC ¶¶ 58-
63.)  Plaintiffs' allegations do not satisfy the elements of a
claim for aiding and abetting a breach of fiduciary duty under
either New York or Delaware law.

28

New York courts have taken three approaches to deciding which state's law applies to an aiding and abetting breach of fiduciary duty claim: an internal affairs approach, a torts based "greatest interest" approach, and a hybrid approach. Compare Buckley v. Deloitte & Touche USA LLP, No. 06 Civ. 3291 (SHS), 2007 U.S. Dist. LEXIS 37107, at *37 (S.D.N.Y. May 21, 2007) (holding that aiding and abetting breach of fiduciary duty claim "relate[d] to the internal affairs of a corporation, [it was therefore] governed by the law of the state of incorporation" (citations omitted)) with Solow v. Stone, 994 F. Supp. 173, 177 (S.D.N.Y. 1998) (applying New York law to aiding and abetting claim under tort analysis, in which law of jurisdiction with greatest interest in regulating behavior applies) with Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 191-92 (S.D.N.Y. 2006) (confirming that New York follows the internal affairs doctrine, but does not require its application in every case, particularly if some other state has an overriding interest in dispute). Plaintiffs fail to allege facts sufficient to maintain a claim under either state's law.

Under New York law, a claim of aiding and abetting breach of fiduciary duty has three elements: (1) existence of a

29

breach of fiduciary obligations, of which the aider and abettor
had actual knowledge; (2) the defendant knowingly induced or
participated in the breach; and (3) the plaintiff suffered
damages as a result of the breach.  See In re Sharp Int'l Corp.,
403 F.3d 43, 49-50 (2d Cir. 2005).  Under Delaware law, a claim
for aiding and abetting a breach of fiduciary duty has four
elements: (1) a fiduciary relationship; (2) a breach of that
relationship; (3) knowing participation by the alleged aider and
abettor in the fiduciary's breach of duty; and (4) damages
proximately caused by the breach.  See Gatz v. Ponsoldt, 925
A.2d 1265, 1275-76 (Del. 2007).  Moreover, as noted, because the
Plaintiffs' allegations sound in fraud, these allegations must
be pled with particularity under Rule 9(b).  See DeBlasio, 2009
U.S. Dist. LEXIS 64848, at *14.

        Plaintiffs have failed to allege an underlying breach
of fiduciary duty by Belnovo; GM's knowing participation in
Belnovo's alleged breach of fiduciary duty; or the level of
particularity required by Rule 9(b).

        Under either New York or Delaware law, a claim for
aiding and abetting breach of fiduciary duty is dependent upon
the underlying breach of fiduciary duty.  See, e.g., Kolbeck v.

LIT Am., Inc., 939 F. Supp. 240, 245 (S.D.N.Y. 1996) (existence
of underlying breach is critical to claims of aiding and
abetting, because analysis of secondary liability is necessarily
based on the contours of the primary violation); Binks v.
DSL.net, No. 2823-VCN, 2010 Del. Ch. LEXIS 98, at *38 (Del. Ch.
Apr. 29, 2010) (where court does not perceive underlying breach,
there is no basis from which to derive liability for aiding and
abetting breach of fiduciary duty). As set forth above, the SAC
has failed to state a claim against Belnovo for breach of
fiduciary duty. Consequently, any claim that GM aided and
abetted that alleged breach fails as well.

        Moreover, both New York and Delaware require a
plaintiff to allege facts sufficient to establish that the
alleged aider and abettor knowingly participated in the alleged
breach of fiduciary duty. See Kolbeck, 939 F. Supp. at 247 (New
York law requires "actual knowledge" of and "substantial
assistance" in the breach); Gatz, 925 A.2d at 1276 ("'Knowing
participation in a . . . fiduciary breach requires that the
third party act with the knowledge that the conduct advocated or
assisted constitutes such a breach.'" (quoting Malpiede v.
Townson, 780 A.2d 1075, 1097 (Del. 2001)); see also In re Sharp
Int'l Corp., 403 F.3d at 50 (under New York law, "[s]ubstantial

31

assistance may only be found where the alleged aider and abettor affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur" (internal quotations and citations omitted)); In re OODC, LLC, 321 B.R. 128, 144 (Bankr. D. Del. 2005) (requiring "'that the defendant's conduct gave substantial assistance or encouragement to the fiduciary's wrongful conduct'" (quoting Crowthers McCall Pattern, Inc. v. Lewis, 129 B.R. 992, 999 (S.D.N.Y. 1991)).

Although Delaware courts have found that knowing participation need not be pled with particularity and may be inferred, inter alia, where the terms of the transaction are "egregious," In re Telecomms., Inc. S'holders Litig., No. 16470-NC, 2003 Del. Ch. LEXIS 78, at *9 (Del. Ch. July 7, 2003), the SAC contains no specific evidence that indicate that the terms of the sale of GPIM were unfavorable, much less egregious, to Plaintiffs.  As such, the Court cannot draw an inference of GM's knowing participation on this basis.  Specifically, the GM employees allegedly said that GM did not wish to invest more money in GPIM and suggested that "plaintiffs acquire [Pali's] interest themselves." (SAC ¶ 32.)  Plaintiffs also allege that during a second meeting unnamed members of the Board told Marino and Serpa that GM had decided to exit the business and "the only

32

way GPIM could be saved would be if Plaintiffs took over GPIM."
(Id. ¶ 33.) "The Board asked Plaintiffs to prepare an offer to
acquire GPIM, and told the Plaintiffs that the offer need not
contain any significant cash component." (Id.)

According to the SAC, GM took essentially three
actions that purportedly aided and abetted Belnovo's alleged
breach of fiduciary duty. First, GM set up a subsidiary, GPIM
Holdings, as a vehicle for the purchase of GPIM. Second, two GM
employees were on the GPIM Board, which made statements
purportedly designed to get Plaintiffs to submit an artificially
low bid for GPIM to set up a low valuation for the subsequent
sale to GPIM Holdings. (SAC ¶ 31.) Third, GM purportedly
"exercised financial power over Pali." (Id. ¶ 60.)

These allegations are insufficient because they fail
to allege that these actions enabled Belnovo's alleged breach to
occur. The Plaintiffs state that "Belnovo owed Plaintiffs a
fiduciary duty to not sell GPIM at less than market value" (Id.
¶ 51), and that the triggering of a Required Sale of GPIM under
the LLC Agreement was a breach of this fiduciary duty. However,
the Plaintiffs do not allege that the Required Sale required a
bid in order to set a value and therefore do not explain why the

33

parties' alleged inducement of Plaintiffs to make a $1 offer for GPIM would lead to or assist Belnovo's alleged breach of fiduciary duty.  Similarly, GM's incorporation of GPIM Holdings, and exercise of purported financial leverage over Pali, did not provide substantial assistance to Belnovo's purported failure to either stop the sale or secure a higher price.  Cf. In re Sharp Int'l Corp., 281 B.R. 506, 517 (Bankr. E.D.N.Y. 2002); Greenfield v. Tele-Comms., Inc., Civ. No. 9814, 1989 Del. Ch. LEXIS 49, at *6-*7 (Del. Ch. May 10, 1989).

The Plaintiffs have also failed to plead the allegations underlying the claim that GM aided and abetted a breach of fiduciary duty with the specificity required to meet the particularity requirements of Rule 9(b).  First, Plaintiffs' general and conclusory statements in the SAC that GM:  (1) aided and abetted a breach of fiduciary duty; (2) "knew the transfer was a violation of fiduciary duties"; (3) "knowingly participated in the scheme to defraud Plaintiffs"; and (4) "provided substantial assistance to Belnovo in connection with the scheme" do not meet the heightened pleading requirements. See Glidepath Holding V.V. v. Spherion Corp., 590 F. Supp. 2d 435, 451 (S.D.N.Y. 2007).

34

The factual allegations regarding fraudulent statements do not identify the speakers.  While the SAC states that GM employees Juan Carlos Barrera and Rodrigo Diaz "suggested that Plaintiffs acquire Pali Holdings themselves" (SAC ¶ 32), it does not specify which of them made this suggestion and the remaining allegedly fraudulent statements are attributed generally to the "Board," which consisted of seven people (including Serpa), only two of whom are alleged to be connected to GM.  (Id. ¶ 32-33.)

In addition, some factual allegation supporting actual intent is required.  Glidepath, 590 F. Supp. 2d at 455.  In the current litigation, Plaintiffs allege that GM invested in Pali, and then discovered that Pali failed to disclose material information.  Plaintiffs claim that GM threatened to sue Pali and, thus, speculate "upon information and belief," that GM used this purported leverage to get Pali to sell it GPIM at a below market price.  However, the SAC sets forth no facts that would give rise the required strong inference that GM committed fraud to address these concerns rather than pursue the aforementioned litigation and withholding of committed funds.

35

In ruling upon the motion to dismiss filed by GPIM Holdings, the March 17 Opinion held that the allegations against GPIM Holdings were sufficient to withstand a motion to dismiss. See March 17 Opinion, slip op. at 11-15.  However, GM and Belnovo had not appeared at that time, and had not argued the lack of a breach of fiduciary duty by Belnovo.  Neither GPIM nor GPIM Holdings argued that there was a failure to state a claim for breach of fiduciary duty by Belnovo.  Moreover, in dismissing Plaintiffs' unjust enrichment claim, the Court noted:

> Plaintiffs have not alleged that GPIM Holdings was unjustly enriched, nor have they articulated any facts to support a value for GPIM beyond the $1,000 that Pali Capital accepted in exchange for GPIM's liabilities.  Plaintiffs have not alleged any profit or benefit that GPIM Holdings received as a result of the sale of GPIM in January 2009.  Indeed, Plaintiffs themselves bid only $1.00 for GPIM.  (SAC ¶ 52.) Stated simply, there can be no unjust enrichment where there is no enrichment at all.

Id. at 15-16.

This statement is dispositive of not just the unjust enrichment claim, but of the civil conspiracy and aiding and abetting breach of fiduciary duty claims as well.  Damages are an essential element of both claims, and Plaintiffs have failed to plead them.  See Gatz, 925 A.2d at 1275 ("To state a claim

36

for aiding and abetting a breach of fiduciary duty, a Plaintiff must allege . . . damages proximately caused by the breach."); Allied Capital, 910 A.2d at 1036 ("[T]o state a claim for civil conspiracy, a plaintiff must plead facts supporting . . . that the conspirators caused actual damage to the plaintiff."). Moreover, Plaintiffs' $1 bid to purchase GPIM, and the fact that it was Pali, a separate entity from any of Belnovo, GM or GPIM Holdings, that triggered the sale belie the alleged "self-dealing."

## The Claims Against Belnovo Are Barred By The LLC Agreement

Section 4.3 of the LLC Agreement exculpates Members for any liability "except as provided herein or as required by the [Delaware Limited Liability Company] Act" except to the extent "a judgment or other final adjudication adverse to such Member establishes (i) that its acts were committed in bad faith or were the result of active or deliberate dishonesty or (ii) that such Member personally gained in fact a financial profit or other advantage to which such Member was not entitled."  Such clauses will be enforced under Delaware law.  See Fisk Ventures, LLC v. Segal, No. 3017-CC, 2008 WL 1961156, at *9 (Del. Ch. May 7, 2008) (enforcing provisions of LLC agreement which expressly

37

limited or waived liability); Douzinas, 888 A.2d at 1152
(holding that defendants had a right to rely on exculpatory
provisions limiting liability in LLC agreement when defending
fiduciary duty claims brought against them).

     The SAC does not allege that Belnovo took any action
contrary to the terms of the LLC Agreement or the Delaware
Limited Liability Company Act.  Nor does the SAC plead with
sufficient particularity that Belnovo's actions were committed
in bad faith or that Belnovo gained a financial profit.  See
Wood v. Baum, 953 A.2d 136, 141 (Del. 2008) (holding that an
exculpatory clause in an LLC insulated directors from liability
from certain conduct, and therefore plaintiff must plead
particularized facts alleging a non-exculpated claim against
directors).  Under the Plaintiffs' allegations, Belnovo suffered
the same economic harm that Plaintiffs did.  Belnovo declined to
exercise the ROFO and, thereby, ended up being subjected by Pali
to the same Required Sale.

     In sum, the claims against Belnovo are barred by the
LLC Agreement's provision exculpating members from liability
except in specified circumstances not alleged in the AC.

38

## Conclusion

Based upon the conclusions set forth above, Defendants' motion is granted and the SAC is dismissed as to Belnovo and GM.  The Plaintiffs are granted leave to replead within 20 days.

It is so ordered.

**New York, NY**
**August 25, 2011**

ROBERT W.  SWEET
U.S.D.J.

39